Elliot Gale (Bar #263326)
egale@gajplaw.com
Joe Angelo (Bar #268542)
jangelo@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiff
Cheryl Alphonso

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| CHERYL ALPHONSO<br><br>                Plaintiff,<br><br>       v.<br><br>Experian Information Solutions, Inc.;<br>Equifax Information Services, LLC;<br>TransUnion, LLC; Rushmore Loan<br>Management Services, LLC<br><br>                Defendants. | CASE NO.   2:22-cv-0<br><br>COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act<br>2. Violation of California Consumer Credit Reporting Agencies Act |

COMES NOW Plaintiff Cheryl Alphonso (hereinafter "Plaintiff"), an individual, based on information and belief, to allege as follows:

**INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), 15 U.S.C. §1681i(a)(5)(A)), and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a).

2. Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendant in connection with his inaccurate, misleading, or incomplete reporting of Plaintiff's mortgage with Rushmore Loan Management Services, LLC (hereinafter "RLMS")

3. Here, RLMS continues to report inaccurate and incomplete information regarding Plaintiff's mortgage account.

4. RLMS's reporting of the account is wholly incomplete and misleading.

5. Specifically, RLMS continues to report the account involved in an active bankruptcy despite Plaintiff not being in bankruptcy and the account at issue not subject to any bankruptcy discharge.

6. In addition, RLMS continues to report the account closed without reflecting timely payments despite the fact that the account remains open and timely payments are being made.

7. Such reporting is misleading and adversely impacts Plaintiff's credit worthiness.

8. Plaintiff's credit reports have been disseminated to third parties since the completion of her Chapter 13 bankruptcy.

9. Plaintiff's credit has also been damaged as a result of the inaccurate and misleading reporting.

10. Plaintiff has been denied various unsecured credit cards as a result of the RLMS account tradelines.

11. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

12. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

//

## JURISDICTION & VENUE

13. Plaintiff re-alleges and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.

14. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

15. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

16. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

17. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

18. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's attempt to improve his FICO Score.

19. In the alternative Plaintiff alleges that each and every Defendants actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

20. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

21. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

22. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

23. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

24. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

25. There are 28 FICO Scores that are commonly used by lenders.

26. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

27. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

28. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

29. There are five key factors that a FICO Score considers: 1) Payment History, 2) Amount of Debt, 3) Length of Credit History 4) New Credit and 5) Credit Mix.

30. Each of the five factors is weighted differently by FICO.

31. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

32. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

33. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.
34. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
35. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

### e-OSCAR

36. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.
37. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.
38. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### Metro 2

39. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.
40. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.
41. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

42. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.
43. The CDIA is *the* expert on accurate credit reporting. In support of her allegations Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.
44. The CDIA's Metro 2 is accepted by all CRAs.
45. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
46. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
47. The three main credit bureaus helped draft the CRRG.
48. The CRRG is not readily available to the public. It can be purchased online for $229.45.
49. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.
50. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

51. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.
52. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.
53. All three major CRAs are members of the CDIA
54. The CDIA is on record that they know, understand, and accept mortgages are generally non-dischargeable under 11 U.S.C. §1328(c)(1) and 11 U.S.C. § 1322(b)(5).

**Consumer Information Indicator**

55. When a consumer files for bankruptcy protection certain credit reporting industry standards exist.
56. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.
57. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.
58. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.
59. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.
60. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.
61. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

62. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

63. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

64. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

65. The CII Metro 2 Code "Q" is used when a bankruptcy plan is complete and will remove prior bankruptcy codes on the account; the CII Q is used on liabilities that are not discharged in bankruptcy (such as a mortgage).

66. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

67. Failure to update the CII to a "Q" on a secured non-discharged debt results in it appearing that a consumer, like Plaintiff, included an account in a bankruptcy proceeding despite not having done so.

68. It also may result (as is the case here) where it appears an account continues to be in an *active* bankruptcy when in fact no bankruptcy case is pending.

69. It also results in the account being calculated as a major derogatory or adverse account despite the fact it was not included or discharged.

70. The result lowers a consumer's credit score and makes a consumer appear much less credit worthy.

**Plaintiff's Dispute**

71. On February 16, 2022 Plaintiff ordered a credit report from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiff's creditors after her Chapter 13 bankruptcy was completed.

72. Plaintiff noticed various delinquent and adverse trade lines on his February 16, 2022 credit report. RLMS was not reporting complete information regarding her mortgage, such as RLMS reporting that the account was included/discharged in bankruptcy.

73. In response, Plaintiff disputed the RLMS tradelines with Experian, Equifax, and TransUnion via certified mail in April of 2022.

74. Plaintiff's dispute letters specifically put the Defendants on notice that the accounts should not be listed as discharged, included in bankruptcy, and making payments under a wage earner plan as the account was not included, discharged, or subject to a bankruptcy.

75. Plaintiff's dispute letter specifically stated that the RLMS account should be open/current as Plaintiff continues to make timely payments to RLMS.  To support her dispute Plaintiff included her payment history.

76. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to RLMS via an ACDV through e-OSCAR.

77. On May 31, 2022 after the statutory time period had elapsed for Plaintiff to receive a reinvestigation report from the credit Bureaus, Plaintiff ordered a second credit report from Experian, Equifax, and TransUnion for the sole purpose to ensure Plaintiff's accounts with RLMS had in fact been updated.

### Inaccuracy –RLMS

78. Plaintiffs were frustrated to see that Defendant RLMS did not properly update the account.

79. RLMS was still reporting the account as included and or discharged in bankruptcy and making payments under a wage earner plan despite the account not being included or discharged in Plaintiff's chapter 13 bankruptcy.

80. RLMS's reporting is inaccurate because Plaintiff did not include or seek to discharge her mortgage with RLMS in their bankruptcy filing.

81. RLMS's reporting is entirely incomplete, misleading and technically inaccurate.

82. The reporting is incomplete because the report lacks any updates on the account.

83. RLMS should have updated the CII to report a "Q" as instructed by the CRRG after Plaintiffs completed her chapter 13 plan, or at least removed the bankruptcy notations.

84. As it stands it appears that RLMS continues to report the CII "D" making it appear that Plaintiff continues to be in an active bankruptcy and that the account may or may not be subject to Plaintiff discharge given that such a discharge has been completed.

85. To be clear, it is IMPOSSIBLE for accuracy purposes for RLMS to accurately report a CII "D" post discharge.
86. The CII "D" should only be reported during an active bankruptcy. Plaintiff is no longer in bankruptcy and the account at issue was: 1) not discharged per the CRRG and the bankruptcy code, and 2) not currently in bankruptcy.
87. As a result, RLMS should know that the CII "D" cannot possibly be accurate.
88. Moreover, RLMS has entirely failed to report Plaintiff consistent on time mortgage payments.
89. Such reporting remains wholly incomplete and would lead lenders to question whether or not Plaintiff has made mortgage payments consistently. Thus, such reporting makes Plaintiff appear less credit worthy.

**Willfulness**

90. This was not a negligent act by Defendant RLMS but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore his credit.
91. RLMS's reporting makes Plaintiff appear less credit worthy because the lack of any update on the account makes it appear that Plaintiff sought to discharge and include her mortgage in her chapter 13 bankruptcy proceeding and that Plaintiff remains in an active Chapter 13.
92. RLMS knows that its reporting must be accurate and complete.
93. RLMS, with knowledge of Plaintiff dispute, chose NOT to update Plaintiff's credit report and instead still reported that the account was subject to a chapter 13 bankruptcy and otherwise may or may not be discharged.
94. Such a scheme directly undermines the integrity of the credit reporting system at large.

**Damages**

95. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.

96. RLMS' inaccurate reporting has been transmitted to third parties since Plaintiff completed her Chapter 13 case and negatively impacted Plaintiff's ability to obtain and rebuild her credit.

97. RLMS' reporting has diminished Plaintiff's credit score.

98. The actions of Experian, Equifax, TransUnion, and RLMS as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants Experian, Equifax, and TransUnion)

**Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC – Failure to Assure Credit Reporting Accuracy.**

99. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

100. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

101. Had Experian, TransUnion, and Equifax maintained reasonable procedures to assure maximum accuracy Experian, TransUnion, and Equifax would never have allowed Defendant RLMS to report the account as described herein.

102. RLMS appears to be reporting a "CII" that refers to an active bankruptcy.

103. Experian, TransUnion, and Equifax all are reporting that Plaintiff has completed his bankruptcy and therefore should know that RLMS's reporting cannot possibly be accurate.

104. Even assuming the CRAs are not sophisticated enough to address this obvious contradiction, Plaintiff disputed the account and the CRAs still did not fix the issue.

105. Plaintiffs informed Experian, TransUnion, and Equifax that the information reported by RLMS was incorrect because Plaintiff provided verification that RLMS account was

open and timely payments were made. The verification provided by Plaintiff came directly from RLMS.

106. Instead, the account remains unchanged.

107. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

### Willfulness

108. The violations described herein by Experian, TransUnion, and Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

109. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.

110. Such a finding should shock the conscience.

111. When those errors are disputed Equifax, TransUnion, and Experian intentionally send consumer disputes to employees who do not live within the continental United States.

112. This is intentionally done to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

113. Such a policy also inevitably leads to disputes going unresolved as these employees for Defendants Experian, TransUnion, and Equifax receive little to no training concerning how to accurately report consumer debt.

114. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F. Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols.*, Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols.*, No. CV 14-05276-AB (ASX)

115. Experian, TransUnion, and Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

116. Experian, TransUnion, and Equifax have intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

117. Experian, TransUnion, and Equifax also allowed RLMS to report the account with inaccurate information despite specifically being told in the dispute letter why the information RLMS was reporting was incorrect.

118. Experian, TransUnion, and Equifax are members of the consumer data industry association

119. Despite the CRAs having actual knowledge of Plaintiff's bankruptcy, RLMS reporting the account included in an ongoing bankruptcy, and the bankruptcy actually being closed, Experian, TransUnion, and Equifax continue to allow RLMS to report the account included and discharged in bankruptcy.

120. Not only are Experian, TransUnion, and Equifax allowing RLMS to report in a manner that they know is factually impossible (an account cannot be included in an on-going bankruptcy if the bankruptcy has been closed) but in a manner the CDIA has specifically briefed as inaccurate.

121. As a result, Experian, TransUnion, and Equifax are allowing RLMS to report in a manner they know is factually and legally inaccurate.

122. Consequently, Defendants Experian, TransUnion, and Equifax are liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

123. In the alternative, Experian, TransUnion, and Equifax were at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

124. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### SECOND CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against All Defendants)

**RLMS – Failure to Reinvestigate.**

125. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.
126. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.
127. Defendants RLMS violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.
128. The CRAs provided notice to RLMS that Plaintiff was disputing the inaccurate and misleading information, but RLMS failed to conduct a reasonable investigation of the information as required by the FCRA.
129. Based on Plaintiff's dispute, RLMS should have known that its reporting was incomplete as Plaintiff's dispute letters highlighted the problems with the tradeline.
130. The most basic investigation would simply involve reading Plaintiff's dispute letters.
131. Plaintiff alleges RLMS did not review well established industry standards for credit reporting.
132. If RLMS had reviewed such standards, RLMS would have seen its reporting was not in compliance and in accordance with the CRRG and consequently inaccurate and or incomplete.
133. Moreover, had RLMS done any investigation whatsoever it would have uncovered that its reporting showed an active and discharged bankruptcy when in fact Plaintiff was not actually in bankruptcy at all and the account as still open / current rather than closed.
134. The lack of investigation is unreasonable.
135. Plaintiff further alleges that RLMS has not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Experian, TransUnion and Equifax – Failure to Reinvestigate Disputed Information.**

136. Plaintiff re-alleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

137. After Plaintiff disputed the account mentioned above, Experian, TransUnion, and Equifax were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.

138. Experian, TransUnion, and Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

139. Experian, TransUnion, and Equifax could not have possibly done any type of reasonable investigation into this matter as Plaintiff explicitly explained that the RLMS account was not included or discharged in their bankruptcy and provided information regarding payment of the loans verifying that the account was open and current.

140. Plaintiff alleges that Experian, TransUnion, and Equifax have its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

141. Experian, TransUnion, and Equifax are not passive entities bound to report whatever information a DF provides.

142. Given the aforementioned, Plaintiff allege that Experian, TransUnion, and Equifax can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

143. Experian, TransUnion, and Equifax can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

144. Experian, TransUnion, and Equifax failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiff's dispute letters.

145. Experian, TransUnion, and Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

146. Experian, TransUnion, and Equifax intentionally, willfully or with reckless disregard for Plaintiff's accuracy did no investigation whatsoever given that Experian, TransUnion, and Equifax's general policy is to simply parrot whatever information a data furnisher sends.

147. Such policies and procedures inherently lead to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

### THIRD CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants Experian, TransUnion and Equifax)

**Experian, TransUnion, and Equifax – Failure to Review and Consider All Relevant Information.**

148. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

149. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

150. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

151. The violations by Experian, TransUnion, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

152. In the alternative Experian, TransUnion, and Equifax were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

153. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants Experian, TransUnion, and Equifax)

**Experian, TransUnion, and Equifax– Failure to Delete Disputed and Inaccurate Information.**

154. Plaintiff re-alleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

155. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

156. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

157. The violations by Experian, TransUnion, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

158. In the alternative, Experian, TransUnion, and Equifax were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

159. Plaintiff are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FIFTH CAUSE OF ACTION
(Violation of California Consumer Credit Reporting Agencies Act
California Civil Code § 1785.25(a) Against Defendant RLMS)

**RLMS – Reporting Inaccurate Information to CRAs.**

160. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

161. In the regular course of its business operations, RLMS routinely furnishes information to credit reporting agencies pertaining to transactions between Defendants and

Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

162. RLMS intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not follow with well-established industry standards.

163. Plaintiff alleges that RLMS re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

164. Plaintiff also alleges that RLMS all had reason to know that the information reported on Plaintiff's account was misleading, inaccurate, and incomplete.

165. Plaintiff alleges that RLMS all had reason to know that by not complying with well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.

166. Plaintiff alleges that the dispute letters from all three credit reporting agencies, the consumer data industry resource guide, and results of its investigation should have provided notice to RLMS of its misleading and inaccurate reporting.

167. RLMS failed to notify Experian, TransUnion, and Equifax that the information Defendants RLMS re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

168. RLMS' communications of false information, and repeated failures to investigate, and correct its inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiff's rights.

169. As a direct and proximate result of RLMS' willful and untrue communications, Plaintiff has suffered actual damages including but not limited to reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, denial of credit, and such further expenses in an amount to be determined at trial.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

//

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff hereby demands a trial by jury for all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;
3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31
4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o; California Civil Code § 1785.31;
5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and
6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: June 22, 2022

*/s/ Joe Angelo*
Joe Angelo
Attorneys for Plaintiff